Donald SHAW, George Wallace Shaw, and Catherine Bramlett Shaw, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 89–7 V.

United States Claims Court.

Nov. 7, 1989.

Robert L. Russel, Colorado Springs, Colo., for petitioners.

Barbara Hudson, Rockville, with whom were Stuart E. Schiffer, Acting Asst. Atty. Gen., and John Lodge Euler, Deputy Director, for respondent.

## OPINION AND ORDER[1]

RADER, Judge.

In this action under the National Childhood Vaccine Injury Act of 1986, codified as amended at 42 U.S.C. §§ 300aa–1 (Supp. V 1987) (the Act), petitioners seek compensation for injuries to Mr. Donald Shaw. On September 15, 1969, Dr. H.W. Houf administered a measles vaccine to Mr. Shaw, then a four-year-old child. Twenty minutes after the vaccination, Mr. Shaw collapsed and stopped breathing. Five weeks later, Mr. Shaw suffered a seizure. Over the past 20 years, Mr. Shaw has suffered from a recurring seizure disorder.

On January 27, 1989, petitioners filed a claim with the United States Claims Court for compensation under the Act. Respondent, after filing an answer contesting petitioners' entitlement under the Act, withdrew from the case on May 9, 1989. On July 25, 1989, the Special Master held a hearing to take evidence from eight witnesses for the petitioners. Respondent, consistent with its notice of withdrawal, did not appear at the hearing.

On September 22, 1989, the Special Master filed a Report and Recommended Decision (Report). The Report recommended

---

**1.** This opinion and order may contain information that may not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12(c)(2) (Supp. V 1987). Accordingly, within fourteen days after the date of this opinion and order, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report, there are no objections filed within the fourteen day period, then it shall be deemed that there is no material subject to § 300aa–12.

an award to Mr. Shaw of $86,258.00 for future medical and rehabilitative expenses, $484,532.00 for lost earnings, $200,000.00 for pain and suffering, and $10,350.42 for attorney fees and costs.

Respondent filed an Objection to Report and Recommendation for Judgment (Objection) on October 12, 1989. Respondent contended that petitioners had not shown an injury listed in the Vaccine Injury Table, 42 U.S.C. § 300aa–14 (the Table), nor causation in fact. Respondent also challenged the Report's recommended award for pain and suffering, lost earnings, attorney fees, and costs in excess of the $30,000.00 cap in 42 U.S.C. § 300aa–15(b). In addition, respondent contested the Report's increased award for impaired wages to offset taxes on interest earned from investment of the recommended compensation. Finally, respondent faulted the Report for failure to reduce the compensation to account for any payments Mr. Shaw might receive from an insurance policy.

On October 26, 1989, petitioners filed a motion to reopen this case. Petitioners' motion requested the opportunity to present additional evidence to enhance the recommended award for future medical and rehabilitative expenses.

On November 1, 1989, this court entertained oral argument. Based on respondent's and petitioners' arguments and the Report, this court remands the case to the Special Master to take additional evidence from both parties. In particular, this court orders respondent to appear before the Special Master and present expert medical testimony and evidence.

## Discussion

Respondent objects to the Report on four grounds: insufficient proof of causation or injury covered by the Table, improper application of the $30,000.00 cap, incorrect increase in impaired wages to account for potential taxes, and inattention to the statutory requirement to reduce the award by the amount of any overlapping insurance coverage. In order to facilitate reconsideration by the Special Master under compressed time limits, this court provides rulings and instructions on several of these outstanding issues.

### Table Injury

The Act authorizes compensation "to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderence of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderence of the evidence that the illness, disability, injury, condition, or death ... is due to factors unrelated to the administration of the vaccine...."

42 U.S.C. § 300aa–13(a)(1). Petitioners bear the burden of proving the factors stated in § 300aa–11(c)(1). Section 300aa–11(c)(1) requires, in principal part, that petitioners show either that they "sustained ... [an] injury or condition set forth in the Vaccine Injury Table" or that they "sustained ... [an] injury, or condition not set forth in the Vaccine Injury Table but which was caused by a vaccine...." 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I). Thus, petitioners must show by a preponderance of the evidence either that they sustained a Table injury or that the vaccine in fact caused their injury.

■ To show a Table injury, petitioners must prove two elements. First, petitioners must show that they sustained an injury—e.g., encephalitis, anaphylaxis, residual seizure disorder—listed on the Table in § 300aa–14. Second, petitioners must show that they suffered the first symptoms of this injury within the time limits listed on the Table. Thus, the Vaccine Injury Table sets forth a list of vaccines, potential injuries, and time frames for initial manifestation of the injury. If an individual received a listed vaccine and sustained a listed injury within a listed time period, the injury is presumed compensable.

The Vaccine Table, in effect, determines by law that the temporal association of certain injuries with the vaccination will constitute sufficient proof that the vaccine caused the harm. The Table replaces traditional tort standards of causation in fact

with a causation in law based on temporal association.[2] The House Committee on Energy and Commerce explained the merits of this approach:

> The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination. The Committee further recognizes that the deeming of vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related. The Committee anticipates that the research on vaccine injury and vaccine safety now ongoing and mandated by this legislation will soon provide more definitive information about the incidence of vaccine injury and that, when such information is available, the Secretary or the Advisory Commission on Childhood

Vaccines (discussed below in Section 2119) may propose to revise the Table, as provided below in Section 2114. Until such time, however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors.

H.R.Rep. No. 99–908, 99th Cong., 2d Sess., pt. 1, at 18 (1986), U.S.Code Cong. & Admin.News 1986, pp. 6287, 6359. Thus, the Act provides in the Table standards for causation at law based on proximate temporal relationship between the vaccination and the onset of certain injuries.

In the case at bar, Mr. Shaw was generally a very healthy child until administration of the vaccine. Report, at 2–3. On one occasion, however, Mr. Shaw had

---

**2.** This relaxation in the Table of traditional standards of proof for causation made the National Childhood Vaccine Injury Compensation Program a controversial legislative proposal. Senator Quayle stated during Senate consideration:

> [T]here are some aspects of the bill about which the White House is very upset, in particular the National Childhood Vaccine Injury Act of 1986. They are concerned that this particular part of the legislation will be costly ... that it may open the floodgates to similar other coverage of types of injuries under a no-fault system.

132 Cong.Rec. S 17344–45 (daily ed. Oct. 18, 1986). The Department of Justice also objected to the bill's alteration of traditional tort causation:

> The establishment of an entitlement program for persons who believe that they have been injured by a vaccine is a major step which we do not believe should be undertaken in the absence of compelling evidence that the existing method of compensating victims through the tort system is inadequate. In this regard, it should be noted that our society relies on the tort system to provide compensation for tens of thousands of personal injury cases every year, many of which involve children severely and permanently injured through no fault of their own. It is unclear why the tort system, as a vehicle for providing compensation, apparently is considered adequate for these tens of thousands of cases every year, yet should be considered inadequate for a relative handful of vaccine-related injury cases.
>
> . . . .
>
> [A]doption of a no-fault approach will not significantly simplify the process of determining which claimants should receive compensation. The time and resource consuming issue in vaccine-related injury cases is not fault, but causation; that is, whether the vaccine caused the injury. Because the epidemiological evidence indicates that there are only a handful of childhood vaccine-related injury cases every year, it may be far more cost effective to leave such cases in the tort system which is well designed to ascertain causation, than to incur the significant expenses of creating and administering a no-fault administrative system that may provide only marginal resource savings over the tort system.

National Childhood Vaccine Injury Compensation Act of 1985: Hearing on S.827 Before the Senate Comm. on Labor & Human Resources, 99th Cong., 1st Sess. 228, 231 (1985).

Due to these questions, among others, the Senate delayed approval for the Act. In fact, the Act was the last bill passed in the 99th Congress. At length, the Act passed the Senate because Chairman Orrin G. Hatch of the Labor and Human Resources Committee refused to permit adjournment *sine die* before enactment of P.L. 99–660. The Majority Leader commented on the controversy and Senator Hatch's role in enactment of P.L. 99–660:

> Mr. DOLE. Mr. President, I commend the distinguished Senator from Utah, because, as the Senator from Tennessee just indicated, he had been literally climbing the wall today to get this done. A few of us are bruised and battered. But he succeeded and I think that is an indication of his determination.
>
> I want the record to reflect—I think he has been very fair about it—that there are a number of people in the administration who may have a problem with one part of the bill. I think there is concern about launching into a new immunization area.

132 Cong.Rec. S 17348 (daily ed. Oct. 18, 1986).

stopped breathing following tonsil surgery. Report, at 3.

■ On September 15, 1969, Dr. Houf administered a measles vaccination to Mr. Shaw. Report, at 3–4. Twenty minutes later, Mr. Shaw collapsed and apparently stopped breathing. Report, at 4. Dr. Houf attributed this episode to a "shot reaction." *Id.* Over the next five weeks, Mr. Shaw suffered three episodes described in hospital records as "fainting spells." *Id.*

On October 22, 1969, five weeks after administration of the vaccine, Mr. Shaw had a seizure. *Id.* Mr. Shaw's parents immediately took him to a hospital for treatment. The hospital administered an electroencephalogram (EEG). This EEG, and two later EEGs, indicated an encephalopathy. Report, at 4–5, 8.

Since then, Mr. Shaw has continued to suffer from a seizure disorder. Report, at 5–6. At the Special Master's hearing, Drs. Paap and Gibson testified "to a reasonable degree of medical certainty" that the vaccine caused Mr. Shaw's disorder. Report, at 7. Another medical expert, Dr. Kassover, could think of no alternative cause for the disorder. Report, at 8.

On the basis of this evidence, the Special Master concluded that Mr. Shaw suffered two injuries listed on the Table—encephalopathy and residual seizure disorder—manifested by symptoms which appeared within 15 days of the vaccination. Report, at 8. Respondent challenges this conclusion by contending that "an abnormal EEG is not conclusive of an encephalopathy." Objection, at 4. Yet, the Act states:

> Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs.... Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

42 U.S.C. § 300aa–14(b)(3)(A). Thus, the Special Master appropriately relies heavily upon the EEG results in determining that Mr. Shaw experienced an encephalopathy. The Special Master also received testimony from medical experts about the nature of Mr. Shaw's injury. Respondent to date has produced no evidence that Mr. Shaw does not suffer from encephalitis.

■ Respondent also contends that the record does not support the Report's conclusion that the onset of either the encephalopathy or the seizure disorder occurred within 15 days of the vaccination as required by the Table. Mr. Shaw collapsed within 20 minutes of the vaccination and experienced "fainting spells." Five weeks after the vaccination, Mr. Shaw suffered a seizure.

Petitioners stated at oral argument that Mr. Shaw's mother described the three fainting spells, which may or may not have occurred within the 15–day limit, as similar to the documented seizure which occurred on October 22, 1969. Moreover, Dr. Houf characterized, sight unseen, Mr. Shaw's first episode immediately after the vaccination as a "shot reaction." This court lacks the required "medical records" or "medical opinion" to conclude that the episode 20 minutes after the vaccination, or the fainting spells, signaled the onset of encephalopathy or a residual seizure disorder. This court cannot determine, absent medical expert testimony, that a fainting spell constitutes a seizure. Nor can the court determine that Mr. Shaw's episodes signal the onset of encephalopathy. Thus, this court requires additional medical evidence to determine if Mr. Shaw suffered the first symptoms of a Table injury within the specified time frames.

### Causation in Fact

The Act, in addition to providing compensation for injuries meeting the Table's legal standards for causation, also compensates individuals who can show that a vaccine in fact caused their injury. The traditional causation in fact standard governs vaccine tort cases in state and federal courts outside the Act. *See, e.g., Alvarez v. United States,* 495 F.Supp. 1188, 1206 (D.Col.1980). These other state and federal vaccine tort cases are not subject to the compensation limits of the Act.

■ Temporal association alone establishes legal causation for a Table injury. Temporal association of the onset of injury with the vaccination is not sufficient, how-

ever, to establish causation in fact. *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir.1983). A Court of Appeals ruling clarifies:

> [T]he inoculation is not the cause of every event that occurs within the ten day period.... Without more, this proximate temporal relationship will not support a finding of causation.

*Hasler*, 718 F.2d at 205. When a petitioner relies upon proof of causation in fact rather than proof of a Table injury, a proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury. To prove causation in fact, petitioners must show a medical theory causally connecting the vaccination and the injury. *Hasler*, 718 F.2d at 205–06.

The statute distinguishes Table injuries from injuries possibly caused in fact by the vaccine. Section 300aa–11(c)(1)(C)(i) discusses Table injuries. Section 300aa–11(c)(1)(C)(ii) discusses two forms of injury requiring proof of causation in fact. Subparagraph (I) discusses injuries "not set forth in the Vaccine Injury Table but which [were] caused by a vaccine...." Sub-paragraph (II) discusses injuries "set forth in the Vaccine Injury Table the first symptom or manifestation ... of which did not occur within the time period set forth in the Table but which [were] caused by a vaccine...."

In addition to the statutory language, the Act's legislative history distinguishes the proof requirements for a Table injury from proof of causation in fact. The House Committee on Energy and Commerce stated:

> If the petitioner sustained or had significantly aggravated an injury not listed in the Table, he or she may petition for compensation. If the petitioner sustained or had significantly aggravated an injury listed in the Table but not within the time period set forth in the Table, he or she may petition for compensation. In both of these cases, however, the petition must affirmatively demonstrate that the injury or aggravation was caused by the vaccine. Simple similarity to conditions or time periods listed in the Table is

not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner. (Such a finding of causation is deemed to exist for those injuries listed in the Table which occur within the time period set forth in the Table.)

H.R.Rep. No. 99–908, 99th Cong., 2d Sess., pt. 1, at 15 (1986), U.S.Code Cong. and Admin.News 1986, p. 6359.

In sum, causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect. Temporal association between the injury and the vaccination alone does not prove causation in fact.

■ In addition to finding that Mr. Shaw suffered injuries listed on the Table, the Report concluded that the measles vaccine in fact caused the injuries. Report, at 10–11. Respondent contends that the Report offers no medical theory for how the vaccine caused the injuries. In the case at bar, the unrebutted testimony of three medical experts that the vaccine caused the injury tends to establish a causal link between the vaccine and the injuries. The Report, however, does not specify the reputable medical theory upon which these experts relied in reaching their conclusion about causation. This court requires additional medical evidence to determine causation in fact.

*Alternative Etiology*

The Act also requires this court to determine the absence of causes other than the vaccination before awarding compensation. 42 U.S.C. § 300aa–13(a)(1). A successful showing of legal causation or causation in fact does not entitle petitioners to compensation. The court must still determine that the preponderance of evidence does not show an alternative cause for the injury.

■ Section 300aa–13 specifically requires petitioners to carry the burden of proving a Table injury or causation in fact.

Section 300aa–13, however, does not state whether petitioners or respondent carry the burden of showing the absence of an alternative cause. This court must weigh the record as a whole to determine whether the evidence, by a preponderance, indicates an etiology unrelated to the vaccine. Both the petitioners and the respondent provide evidence concerning causes of the injuries. 42 U.S.C. § 300aa–11(c); 42 U.S.C. § 300aa–12(b). This court weighs that evidence to determine whether the injury is due to a cause other than administration of the vaccine. 42 U.S.C. § 300aa–13(a)(1)(B).

The Act also contains a presumption that, in the absence of proof of another cause, the vaccine caused the encephalopathy. 42 U.S.C. § 300aa–14(b)(3)(B). This presumption appears to override the temporal relationship requirements of the Table. The House Report, however, explains:

> [T]he subsection also restates in specific terms the general rule described in Section 2113 and provides that if the cause of an encephalopathy is an infection or another condition not related to the vaccine, the encephalopathy is not to be considered compensable. If, however, the court if unable to determine the cause of an encephalopathy, the encephalopathy is to be considered compensable if other conditions (including specified time of initial onset) are met.

H.R.Rep. No. 99–908, 99th Cong., 2d Sess., pt. 1, at 19 (1986), U.S.Code Cong. & Admin.News 1986, p. 6360. Thus, this presumption in § 300aa–14 merely restates specifically the requirements of the Table, including time limits for the onset of the injury. This specific restatement supplies insight into the kinds of alternative etiologies for encephalitis. Respondent to date has produced no evidence that Mr. Shaw's encephalopathic condition, however, resulted from "infection, toxins, trauma, or metabolic disturbances." 42 U.S.C. § 300aa–14(b)(3)(B).

At oral argument, respondent suggested that Mr. Shaw's condition might be epilepsy, not a vaccine-related disorder. To date, respondent has not presented for the evidentiary record any medical records or opinions supporting this alternative etiology. This court cannot on the record as a whole (as presently constituted) determine that Mr. Shaw's condition "is due to factors unrelated to the administration of the vaccine." 42 U.S.C. § 300aa–13(a)(1)(B).

■ Petitioner suggests that respondent unfairly interposes objections to the Report after the Special Master has submitted the Report. The Special Master's submission of a report does not close the record of this case. The Act requires the court to consider "in addition to all other relevant medical and scientific evidence contained in the record ... the results of any diagnostic or evaluative test which are contained in the record...." 42 U.S.C. § 300aa–13(b)(1)(B). Moreover, "[i]n evaluating the weight to be afforded to any such diagnosis, conclusion, judgment, test result, report, or summary, the court shall consider the entire record and the course of the injury, disability, illness, or condition until the date of the judgment of the court." 42 U.S.C. § 300aa–13(b)(1)(B). Until the date of the judgment of the court, the record remains open. Both petitioner and respondent have authority in the Act to object to the Special Master's Report. 42 U.S.C. § 300aa–12(d)(1). Upon receipt of an objection, this court must review the record to that point in the proceedings. 42 U.S.C. § 300aa–12(d)(1). This court may undertake a *de novo* determination of any issue or remand for further proceedings. 42 U.S.C. § 300aa–12(d)(1). Until entry of judgment, the record of proceedings is not closed and this court retains an obligation to consider all scientific, medical, and legal matters brought to its attention by either party.

### *$30,000.00 Cap*

■ The Report recommended award of $200,000.00 for pain and suffering, $484,-532.00 for lost wages, and $10,350.42 for attorney fees and costs. Report, at 23. Respondent contends that this recommended award would exceed the $30,000.00 statutory cap of 42 U.S.C. § 300aa–15(b). Respondent would apply the cap to the aggregate of pain and suffering, lost

wages, and attorney fees and costs. The Report recommends application of the cap to only that portion of attorney fees and costs expended to prove damages for pain and suffering and lost wages. Report, at 17–22.

The language, legislative history, and logic of § 300aa–15(b) support respondent's reading of this provision. In retroactive cases—cases where the vaccination occurred before enactment of the Act —§ 300aa–15(b) lists what compensation the court may award. Specifically, the first clause of § 300aa–15(b) states that the court "may not" award pre-judgment medical or rehabilitative expenses. 42 U.S.C. § 300aa–15(b). Under the next clause of § 300aa–15(b), the court may award attorney fees and costs provided in section 300aa–15(e). *Id.* Finally, according to § 300aa–15(b)'s final clause, the court may award compensation for lost wages under § 300aa–15(a)(3) and for pain and suffering under § 300aa–15(a)(4), "except that the total amount that may be paid [for these two items] ... and included as attorneys' fees and other costs" may not exceed $30,-000.00. The Act does not expressly state, but clearly intends, that this court may award compensation for post-judgment medical and rehabilitative expenses in retroactive cases.[3]

By setting off the exception clause with a comma, the Act shows an intention to apply the $30,000.00 cap only to those elements listed after the grammatical separation—lost wages, pain and suffering, and attorney fees and costs. The words "the total amount" also suggest the totalling of different compensation elements—lost wages, pain and suffering, and attorney fees and costs—before application of the limitation. Indeed, as pointed out earlier by the Claims Court, the "and included as"

language also links references to the different elements of §§ 300aa–15(a)(3), (a)(4), and (e). *Mikulich v. Secretary of Health & Human Servs.,* No. 88–2V, slip op. (Cl.Ct. July 27, 1989). The court must add these different elements together before applying the cap. The statutory language supports respondent's reading.

The legislative history of § 300aa–15(b) also suggests that the cap applies to the aggregate of awards under §§ 300aa–15(a)(3), (a)(4), and (e). Congress added the contested language to the Act in the Omnibus Budget Reconciliation Act of 1987. The House Report accompanying that 1987 amendment included a letter from the Congressional Budget Office:

> Although the types of compensation payable [in retroactive cases] would be expanded under the bill, a limit of $30,000 would be imposed on the total of payments for income loss, attorneys' fees and pain and suffering.

H.R.Rep. No. 391(I), 100th Cong., 1st Sess., 693 *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 1213–367.

The section-by-section analysis of § 300aa–15(b) further clarified:

> The amendments also authorize payment for lost earnings and pain and suffering [in retroactive cases], but limit the amount of payment that can be made for all compensation except future medical expenses to a total of as much as $30,-000, depending upon demonstrated need and particular circumstances.

H.R.Rep. No. 391(I), 100th Cong., 1st Sess, 697–98 *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–371 to 2313–372. These statements in the House Report suggest that the $30,000.00 cap applies to the total of three elements of compensation.

---

3. The legislative history expressly states this intent. For instance, the House Report on the Omnibus Budget Reconciliation Act of 1987 included a letter from the Congressional Budget Office:

> Under current law, limited compensation would be available to those who suffered certain vaccine-related injuries prior to the effective date of the program. For these retroactive cases, compensation would be made to cover death settlements and attorneys' fees

and periodic payments would be made to cover future medical and rehabilitation expenses. H.R.Rep. No. 391(I), 100th Cong., 1st Sess. 693 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–367. Furthermore, the section-by-section analysis in that Report stated:

> The Act allows retrospective cases to recover only for ongoing medical expenses and for attorney fees and costs.

*Id.* at 2313–371.

Finally, petitioners argue for application of the cap only to attorney fees. Petitioners, however, offer no reasonable explanation for why Congress would apply the cap to only that portion of attorney fees generated in proving pain and suffering and lost wages. Petitioners are most likely to incur attorney fees in proving entitlement to compensation, yet the Report would exempt those attorney fees from the cap. Thus, a limit on attorney fees would not logically encompass only those attorney fees incurred to prove two narrow kinds of compensation.

The Report's reading of § 300aa–15(b) would compensate some attorney time and subject other attorney time to a cap. Thus, a determination of attorney fees would require apportionment between capped and fully compensable attorney fees. The Claims Court has commented on the difficulty of such apportionments:

> It would be nearly impossible to segregate the efforts expended on the liability issue from those devoted to damages questions in this case.

*Kunz Const. Co., Inc. v. United States*, 16 Cl.Ct. 431, 435 (1989). In vaccine cases, proof of liability is also intertwined with proof of damages. For this reason as well, the Report's reading of § 300aa–15(b) defies application.

This court determines that § 300aa–15(b) requires application of the $30,000.00 cap to the total compensation awarded for pain and suffering, lost wages, and attorney fees and costs.

### Taxes In Computing Net Present Value

■ Section 2115(f) of the Act requires the court to pay any compensation "in a lump sum determined on the basis of the net present value of the elements of the compensation." 42 U.S.C. § 300aa–15(f)(4)(A). In determining the net present value, the Report enhanced the recommended award for lost earnings to account for taxes on the interest earned from investment of the award amount. Respondent challenges this computation for lack of a statutory basis.

The Report does not recommend enhancement of the lost wages element of compensation without basis in the Act. The Act authorizes the court to figure the net present value of each element of compensation in arriving at a lump sum payment. A net present value computation attempts to reflect in current sums the value of a future entitlement. A lump sum payment today appreciates over time with the accrual of interest. Thus, applying a discount rate to a future lump sum payment reduces that future entitlement to its present value. By accounting for taxes, a foreseeable drain on interest payments over time, the Report accurately reflects the net present value of the future entitlement. Thus, the Report does not figure taxes into the lost wages award without statutory basis.

Moreover, as the Report points out, the Act requires deduction of taxes in determining lost earnings. When compensating for those same lost wages, "it is only fair that the award should be adjusted to offset taxes which will be paid on such income." Report, at 15.

### Accounting for Insurance

Section 2115(g) of the Act states:

> Payment of compensation under the Program shall not be made for any item or service to the extent that payment has been made, or can reasonably be expected to be made ... under an insurance policy....

42 U.S.C. § 300aa–15(g). Further § 2115(h) provides:

> No policy of health insurance may make payment of benefits under the policy secondary to the payment of compensation under the Program....

42 U.S.C. § 300aa–15(h). Thus the Act ensures that the Program is not primarily liable for vaccine-related injuries. Instead this court must reduce compensation by any amounts reasonably anticipated from an insurance policy.

In the case at bar, the Report notes that Mr. Shaw has an insurance policy. This policy pays for some, but not all of Mr. Shaw's medical expenses. Report, at 13.

Respondent contends, however, that the Report at no point accounts for this policy by reducing compensation. Petitioners respond at oral argument that they have not requested compensation for medical expenses covered by Mr. Shaw's insurance policy. Instead petitioners requested compensation only for medical expenses in excess of Mr. Shaw's insurance coverage. Because petitioners have already followed the instructions of the Act in filing their petition, this court has no reason to reduce any potential compensation to account for insurance coverage.

### Expert Witness Fees

■ The Report invoked 28 U.S.C. § 1821 (1982) to limit recoverable expenses for testimony by experts to $30.00 per day. The Report also cites *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). In *Crawford*, the Supreme Court reviewed an award of fees for expert witnesses to a prevailing party under the general rule of Fed.R.Civ.P. 54(d). The Court concluded:

[A] federal court is bound by the limits of § 1821, absent contract or explicit statutory authority to the contrary.

*Crawford*, 482 U.S. at 439, 107 S.Ct. at 2496. 28 U.S.C. § 1821 states:

(a)(1) Except as otherwise provided by law, a witness in attendance at any court of the United States ... shall be paid the fees and allowances provided by this section.

Both *Crawford* and 28 U.S.C. § 1821 note that explicit statutory authority may take precedence over the strict $30.00 per day limit. The Act expressly permits the Claims Court to award "an amount to cover—

(A) reasonable attorneys' fees, and

(B) other costs,

incurred in any proceeding on such petition." 42 U.S.C. § 300aa–15(e)

This court must also read this express authorization to award "other costs" in the context of the rest of the statute. The Act, for instance, requires the Claims Court to base its judgments on "medical records" and "medical opinion." 42 U.S.C. § 300aa–13(a)(1). The Claims Court must also consider "all other relevant medical and scientific evidence," including diagnoses, medical conclusions, medical judgments, or autopsies. 42 U.S.C. § 300aa–13(b)(1). The Act contemplates that the Claims Court must rely on expert testimony from doctors and other highly trained medical professionals. The United States Court of Appeals for the Eighth Circuit has also allowed expenses for expert witnesses beyond the limits of 28 U.S.C. § 1821 because the testimony was crucial to resolution of the issues. *Crues v. KFC Corp.*, 768 F.2d 230, 234 (8th Cir. 1985).

During oral argument, both respondent and petitioners agreed that a $30.00 cap on expert witness fees would make it difficult, if not impossible, to obtain expert medical witnesses. In light of the explicit statutory authorization to award "costs incurred in any proceeding on such petition" and the statutory requirement to employ medical expert testimony, this court determines that the $30.00 cap in 28 U.S.C. § 1821 does not apply to cases under the Act.

### Motion to Reopen Case

■ Because this court has entered no judgment, this case is not closed. Therefore, petitioners' motion is more appropriately a motion to permit the Special Master to receive additional testimony about compensation. In support of this motion, petitioners show that they failed to take into consideration the life expectancy of Mr. Shaw's parents. In the event of the disability or death of Mr. Shaw's parents, his future residential and custodial expenses would likely increase. Although this information was available to petitioners at the time of the Special Master's initial hearing, this court also acknowledges that Mr. Shaw's case is among the first vaccine cases to receive a hearing before the Claims Court. At this early stage in the understanding of the Act, the court appreciates the possibility that important elements of proof might be overlooked.

Permitting the Special Master to take additional testimony about compensation

amounts in this instance will further the interests of justice and result in no prejudice to the interests of respondent or the vaccine program. Accordingly, this court grants petitioners' motion to permit the Special Master to receive additional testimony about compensation for future residential, custodial, and service expenses for Mr. Shaw.

## ORDER

This court remands this case to the Special Master for further consideration in accord with this opinion. In particular, the Special Master shall take additional testimony from petitioners and respondent as well as any other relevant medical and scientific evidence submitted for the record. The Special Master shall provide an opportunity for petitioners and respondent to provide efficient and informal testimony. Specifically, the Special Master shall provide, preferably by telephone conference, a proceeding less formal, less expensive, more flexible, and more expeditious than traditional litigation, while ensuring fundamental fairness.[4]

This informal proceeding shall focus on the three primary questions for entitlement to causation: First, whether petitioner suffered a Table injury. In the case at bar, petitioner has already shown conditions listed on the Table, but the informal proceeding must examine further the time limits for appearance of the first manifestation of an injury. Second, whether petitioner has shown or can show by a preponderance of evidence causation in fact. And finally, whether the preponderance of the evidence indicates an alternative etiology.

Respondent shall provide expert medical testimony in conformity with the Act and this opinion, including an opportunity for petitioners and the Special Master to ask questions of respondent's medical experts about the basis for their medical conclusions.

At this informal proceeding, petitioners shall provide testimony in accordance with their motion to permit the Special Master to take additional testimony. Respondent and the Special Master shall have an opportunity to ask questions of petitioners' witnesses and attorney about this additional testimony.

After receipt of additional testimony, the Special Master shall provide this court with a supplemental report and recommended judgment no later than January 22, 1990. This schedule will permit this court to issue its judgment before tolling of the statutory time limit for this case on February 26, 1990. This supplemental report shall take into account this opinion and the additional testimony.

---

**4.** The legislative history of the Act supports the informal and flexible, yet fair, process envisioned by this order. The House Committee on Energy and Commerce stated:

> The [vaccine program] is intended to be expeditious and fair.
>
> . . . .
>
> The Committee anticipates that the speed of the compensation program ... will divert a significant number of potential plaintiffs from litigation.
>
> . . . .
>
> The Committee has endeavored to create a swift, uncomplicated compensation system....

H.R.Rep. No. 908, 99th Cong., 2d Sess. 12, 13, 16, *reprinted in* 1986 U.S.Code Cong. & Admin. News. 6353, 6354, 6357. In fact, the House Committee envisioned a relaxation of traditional procedural requirements:

> In order to expedite the proceedings, the power of the Special Master is intended to replace the usual rules of discovery in civil actions in Federal courts. Because the only issues relevant to the compensation proceedings are whether the petitioner suffered a compensable injury and, if so, the extent of compensable damages, there should be no need for a wider inquiry, which might be appropriate in a civil action raising other issues. Thus, while the Special Master may compel any testimony or appearance, neither party is given power to cross-examine witnesses, file interrogatories, or take depositions. In this regard, the Committee expects the Special Master to be vigorous and diligent in investigating factual elements necessary to determine the validity of the petitioner's claim.
>
> *Id.* at 6357–6358.