**Donald SHAW, George Wallace Shaw, and Catherine Bramlett Shaw, Petitioners,**

**v.**

**SECRETARY OF the DEPT. OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 89–7V.

United States Claims Court.

Jan. 31, 1990.

---

**336**

Robert L. Russel, Colorado Springs, Colo., for petitioners.

Barbara Hudson, Rockville, Md., with whom were Stuart E. Schiffer, Acting Asst. Atty. Gen., and John Lodge Euler, Deputy Director.

## ORDER FOR ENTRY OF JUDGMENT

RADER, Judge.

In this action under the National Childhood Vaccine Injury Act of 1986, codified as amended at 42 U.S.C. §§ 300aa–1 et seq. (Supp. V 1987) (the Act), petitioners seek compensation for injuries to Mr. Donald Shaw. On September 15, 1969, Dr. H.W. Houf administered a measles vaccine to Mr. Shaw, then a four-year-old child. Twenty minutes after the vaccination, Mr. Shaw collapsed and stopped breathing. Dr. James Gibson, M.D., testified to a reasonable degree of medical certainty that this episode was a "seizure secondary to the measles vaccination." Transcript of Proceedings, No. 89–7V, filed, Dec. 19, 1989, at 52. Shortly thereafter, Mr. Shaw suffered other seizures. Over the past 20 years, Mr. Shaw has suffered from a recurring seizure disorder.

On January 27, 1989, petitioners filed a claim with the United States Claims Court for compensation under the Act. Respondent, after filing an answer contesting petitioners' entitlement under the Act, withdrew from the case on May 9, 1989. On July 25, 1989, the special master held a hearing to take evidence from eight witnesses for the petitioners. Respondent, consistent with its notice of withdrawal, did not appear at the hearing.

On September 22, 1989, the special master filed a Report and Recommended Decision. The Report recommended an award to Mr. Shaw of $86,258.00 for future medical and rehabilitative expenses, $484,532.00 for lost earnings, $200,000.00 for pain and suffering, and $10,350.42 for attorney fees and costs.

Respondent filed an Objection to Report and Recommendation for Judgment on October 12, 1989. On October 26, 1989, petitioners filed a motion to reopen this case. Petitioner's motion requested the opportunity to present additional evidence to enhance the recommended award for future medical and rehabilitative expenses.

On November 1, 1989, this court entertained oral argument. Based on respondent's and petitioners' arguments and the Report, this court remanded the case to the special master to take additional evidence from both parties. In particular, this court ordered respondent to appear before the special master and present expert medical testimony and evidence.

The special master held a telephonic conference on November 21, 1989 and held a second hearing on December 11, 1989. After taking additional testimony, including testimony from respondent's experts, the special master filed a supplemental recommendation on January 19, 1990. Respondent declined to file any objections to the supplemental recommendations.

After review of the record, this court adopts Special Master Baird's supplemental report according to 42 U.S.C. § 300aa–12(d)(2). This court incorporates into its Order the special master's supplemental report. Thus, this report is attached and will appear as part of this Order.

It is ordered,

The Clerk of the Court shall enter judgment for petitioner Donald Shaw in the amount of $850,246.25 for future medical and rehabilitative expenses as well as for loss of earnings, pain and suffering, and emotional distress. The Clerk of the Court shall enter judgment for petitioners in the amount of $15,985.00 for attorney fees and in the amount of $8,345.75 for costs.

No additional costs.

SUPPLEMENTAL REPORT OF THE SPECIAL MASTER *

January 19, 1990.

PAUL T. BAIRD, Special Master.

This case is before the undersigned on remand from Judge Randall R. Rader. 18 Cl.Ct. 646. The undersigned submitted a Report and Recommended Decision (Report) to Judge Rader on September 22, 1989. An objection to the Report was filed by respondent. Petitioners filed a motion to reopen the case to enable them to produce additional evidence relating to the life care needs of Donald Shaw (Donald). After considering the objection and motion and entertaining oral argument with respect thereto, Judge Rader issued an Opinion and Order (Opinion) providing certain rulings and remanding the matter to the undersigned with instructions to receive additional testimonial and other evidence on the following questions:

First, whether petitioner suffered a Table injury. In the case at bar, petitioner has already shown conditions listed on the Table, but the informal proceeding must examine further the time limits for appearance of the first manifestation of an injury. Second, whether petitioner has shown or can show by a preponderance of evidence causation in fact. And finally, whether the preponderance of the evidence indicates an alternative etiology.

18 Cl.Ct. at 656. The Opinion further directed respondent to provide expert medical testimony and allowed petitioners to produce additional evidence as requested in their motion. The undersigned was required to file a supplemental report and recommended judgment after receipt of the additional evidence. This report is intended to comply with that Opinion.

A telephonic status conference with counsel for both parties was held on November 21, 1989. It was determined that additional testimony should be taken on December 11, 1989. On that date, counsel for respondent appeared with respondent's medical expert, Gabriella Spinella, M.D., in the conference room at the Office of Special Masters. Counsel for petitioners appeared with the following witnesses via telephone from Colorado Springs, Colorado: Donald Shaw, George Wallace Shaw (Mr. Shaw), Katherine Shaw (Mrs. Shaw), James Gibson, M.D., Kenneth P. Olson, and L. Christopher Griffiths, Ph.D.

### When Did The First Symptoms of a Table Injury Occur

■ In her opening statement, counsel for respondent indicated that respondent would not contest that the event which happened on the day of the vaccination was a seizure if petitioners' witnesses so testified. Supplemental Transcript (S.) at 5. On that issue, Donald Shaw testified that he remembered awaking from unconsciousness on that date and being very confused. That is one of the symptoms he experiences when he has a seizure. S. at 13–14. Mr. Shaw testified as to what he observed and did:

I did not see Don when he started to fall, but I did see Don just as he hit the floor. His eyes were rolled back, and his head and mouth were drawn [to the left],[1] and he had a stiffened position. At that moment I had noticed he had stopped breathing, so I gave him mouth to mouth resuscitation, and in a few seconds I could tell that he was breathing, it seemed like normally. Anyway, he was breathing.

Then we took him to Dr. Harry Houf, and his mother noticed that there was a bloody mucus on her arm. He had become very drowsy. He was confused for I would say over an hour.

We told Dr. Houf exactly what took place in detail, and he said that was

---

* This report may contain information that may not be disclosed to a nonparty. See 42 U.S.C.A. § 300aa–12 (West Supp.1989). Accordingly within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

1. *See* S. at 25.

definitely a seizure.... [A]ll of the other seizures are similar or the same.

*Id.* at 18; *see also id.* at 32. He was asked what symptoms he saw that day that were like the symptoms of subsequent seizures:

I have seen many seizures where that he would be in a stiffened position with his head turning to the left and his mouth also drawn to the left when he would hit the floor, ... his drawing of the mouth and bloody mucus. This bloody mucus we've also seen many times on the sheet of his bed that he's had during the night.

*Id.* at 19–20. Mr. Shaw had never seen anything like that prior to September 15, 1969. *Id.* at 20. He said he had seen people faint, and the September 15 episode "wasn't a faint at all." *Id.* at 21. He has never seen Donald faint. *Id.*

Mrs. Shaw testified that in the car on the drive from the fur shop to Dr. Houf's office Donald was very drowsy and dopey and there was bloody mucus on her arm which had come from his mouth. *Id.* at 35. She later observed one other seizure just like the one that occurred in the fur shop. This was just before Donald was first taken to Memorial Hospital. *Id.* at 37. He also had two staring spells in between the two seizures. Based on what she now knows, she considered the staring spells to be petit mal seizures. *Id.* at 39. He had no seizures prior to September 15. *Id.* at 41. He is typically confused after he has had a seizure. *Id.* at 47–48.

Dr. Gibson testified that it was his opinion to a reasonable degree of medical certainty that the episode on September 15, 1969, was a "seizure secondary to the measles vaccination." *Id.* at 52. His opinion that it was a seizure was based on the clinical description given by Mr. Shaw. A fainting spell includes no seizure activity—stiffening of the extremities—and is not followed by confusion. *Id.* at 53, 55, 60–63.

It was Dr. Gibson's opinion that the September 15 episode signalled the onset of an encephalopathy and a seizure disorder. *Id.* at 58–59, 63.

Dr. Spinella[2] testified that it was her opinion to a reasonable degree of medical certainty that it is impossible to determine the initial onset of Donald's seizure disorder. *Id.* at 74. She testified that it appeared from the medical records that Donald suffered from "epileptic drop attacks." His EEG pattern "has been associated with children having epileptic drop attacks or somewhat of an atonic seizure." *Id.* at 75. The episode in June following the tonsillectomy "bears a lot of resemblance to the seizure type or the collapse-like states.... And so, it's quite conceivable that his first seizure occurred following the stress of surgery post operatively." *Id.* at 75–76. The only way to know definitely would have been to have had an EEG connected at the time. *Id.* at 76. She admitted, however, under questioning by petitioners' counsel, that her opinion that the June episode might have been a seizure was based on her review of the medical records and her conclusion therefrom that all the early episodes were similar in nature. It would tend to change her conclusion if the descriptions given in the testimony as to the subsequent episodes were accurate:

The reason that I would have to ... take a step back isn't that the first spell couldn't have been a seizure. It's just that I couldn't tie them to the others descriptively. It still could have been, but I could not tie it to the ones afterwards if the clinical description was what they say now. I have just no reason to believe that.

*Id.* at 79–80.

She explained further:

[I]f Donald Shaw has never had a seizure similar to the atonic spells or the epileptic drop attacks, it would be hard for me to argue that he had only one, and that this one occurred after his tonsillectomy. And so, I would have to put less credence

---

**2.** Dr. Spinella is a medical officer of the Public Health Service assigned to the Vaccine Injury Compensation Program. She also serves as a staff pediatric neurologist at Walter Reed Army Medical Center. She is board certified in pediatrics and board eligible in neurology.

into it. And therefore he would fit into the time frame temporally for the table.

*Id.* at 85–86.

The medical review prepared by Dr. Spinella and dated September 6, 1989, was admitted as exhibit 10. There is no suggestion in that review that the June episode was a seizure, but it does indicate that a "seizure probably occurred temporally following the administration of the vaccine."

Dr. Gibson testified that he did not feel the June episode could have been an atonic seizure because in an atonic seizure one does not stop breathing. *Id.* at 68.

Based on this evidence and that received at the earlier hearing, the undersigned concludes that a preponderance of the evidence supports findings (Nos. 3 and 4) proposed in the Report that Donald suffered two Table injuries—encephalopathy and residual seizure disorder—the first symptoms of which occurred within 15 days following the administration of the measles vaccine on September 15, 1969. A preponderance of the evidence also supports the proposed finding (No. 2) that prior to that administration of the measles vaccine, Donald experienced no seizures or convulsions and there was no indication of encephalopathy.

### Was There Proof of Causation-in-Fact

■ If a petitioner can establish the existence of a Table injury, he need not prove actual causation and is entitled to an award of compensation unless there is a preponderance of evidence that the disability was due to factors unrelated to the administration of the vaccine. Under § 2111(c)(1)(C)(ii)(II), a petitioner will also be entitled to an award of compensation if he can show that a covered vaccine actually caused an injury set forth on the Vaccine Injury Table even though the first symptoms did not appear within the time period set forth in the Table.

The Report did not include a proposed finding as to actual causation, but the Opinion indicated that the "court requires additional medical evidence to determine causation in fact." 18 Cl.Ct. at 651. The court noted:

> causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect. Temporal association between the injury and the vaccination alone does not prove causation in fact.

18 Cl.Ct. at 651. Dr. Gibson did not present such an explanation. Rather, he acknowledged that he didn't "have any real theory." He didn't know exactly what kind of chemical process occurred. S. at 59. Under the standard applied by the court, there is insufficient evidence to support a finding of causation-in-fact.

### Alternative Etiology

■ The medical review prepared by Dr. Spinella concludes that Donald "has chronic idiopathic epilepsy." Ex. 10. The term "idiopathic" means "of unknown causation." Dorland's Illustrated Medical Dictionary (27th ed. 1988) at 815. As noted by the court, "in the absence of proof of another cause, the vaccine caused the encephalopathy" if a Table injury is shown. 18 Cl.Ct. at 652. Although Dr. Spinella testified that Donald appeared to suffer from epileptic drop attacks, that conclusion was based on the assumption that the post-operative incident was an atonic seizure and that the post-vaccination incident was similar in character. She was not able to state with medical certainty that the former incident was a seizure, and, assuming it was not, she agreed that the case falls temporally within the parameters of the Table. She did not suggest an alternative etiology for the post-vaccination seizure as the first seizure. Dr. Gibson testified that there was "no evidence" that "the September 15, 1969 [incident] and all other incidents since then resulted from infection, toxins, trauma or metabolic substances." S. at 68.

Based on the entire record, there is not a preponderance of evidence that Donald's condition "is due to factors unrelated to the administration of the vaccine." 42 U.S. C.A. § 300aa–13(a)(1)(B) (West Supp.1989).

### Future Medical and Rehabilitative Expenses

Donald's parents are quite advanced in age: his mother is 79; his father is 75.

Hearing Transcript at 6, 57. Yet, at the hearing petitioner did not submit any evidence of additional expenses which will be incurred when Donald's parents are no longer able to care for him. Evidence relating to such needs was taken at the December 11 proceeding.

Donald testified that he would prefer to remain living in his parent's home because he is "more relaxed at home, and more comfortable. I have my piano, typewriter, things that I'm used to, and I like to keep occupied. Also, I can have my friends over...." S. at 10. His father said he thought Donald "would be more apt not to have as many seizures as [he would if he were] around other people that were having problems." *Id.* at 23. The present home was built with Donald's needs in mind. *Id.* at 24. Mrs. Shaw also preferred that Donald remains "in his own home where he has his own things and all." *Id.* at 45.

Kenneth Olson reviewed Donald's situation and prepared a life care plan containing two alternative living situations for Donald once his parents are unable to care for him, one involving residency in a life care center and the other involving some independent living in a group home. Ex. 11. Mr. Olson did not prepare a detailed assessment of the costs involved in keeping Donald at home because he "did not feel that would be appropriate." S. at 97. He explained his reasoning:

> [T]here would be periodic abrupt changes in the personnel.
>
> I felt that he needed some socialization outside the home that would take place, and also the additional care in addition to that $100 a day nursing care. He is not doing his own—taking care of his own meals. The house needs—it's a large house. There's a large yard. There's yard care involved, so it would take a number of additional costs in additional care.

*Id.* at 97. He testified further concerning the personnel issue:

> Donald needs some security. I think one of the things that you're going to find with nurse aids or this type of aid, you may not know who's coming in the next day. There's quite often a change in personnel. Occasionally you'll get somebody who's going to be pretty steady and pretty reliable, but that is the exception.
>
> He needs the stability. Stress bothers him. My opinion [is] that this would be a stressful situation of not knowing who may be there with him the next day.

*Id.* at 105.

He testified further concerning the need for socialization. "He has very few friends. The socializing he does do is with his parents. If his parents are no longer here, he's going to be needing somebody to socialize with." *Id.* at 106.

Mr. Olson recommends a life care center, where there would be socialization and no abrupt change in personnel. *Id.* at 98. He is not sure Donald is capable of a semi-independent living arrangement, but suggested that it be attempted while his parents are still living to see if he can adapt to it. *Id.* at 108–110.

Mr. Olson also submitted dollar figures relating to current living expenses for Donald and his parents.

### a. Current Living Expenses

■ Counsel for respondent suggested that compensation is not to be paid for family living expenses, *Id.* at 112, and subsequently filed a memorandum (Memorandum) on the issue of allowable compensation. Respondent points to the legislative history "which states that § 15(c) is not intended 'to provide for the payment of family living expenses....'"[3] Memorandum at 3. Petitioners filed a response to the Memorandum (Response) in which they argued that it is implicit in § 2115(c)—which provides that compensation for residential care should be sufficient to enable the compensated person to

---

3. H.R.Rep. No. 908, 99th Cong., 2d Sess. 1, 21, *reprinted in* U.S.Code Cong. and Ad.News 6287, 6344, 6362.

remain living at home—that living expenses should be included. Otherwise, the person is worse off than he would be in an institution where room and board are included. Petitioners argue further:

It could not be the meaning of Congress that a Thirty Thousand Dollar ($30,000.00) cap would be put on future wages and income, as well as pain and suffering and attorneys fees, and still deny ordinary living expenses. Such a result would be an anomaly, whereby the Petitioner would only receive medical expenses with no other means of providing for his basic residential services.

Response at 1. Petitioners go on to argue that this is particularly so when the compensated person is an adult. *Id.*

While the undersigned is sympathetic to the logic of petitioners' argument, respondent is correct. The Act does not provide for compensation for ordinary living expenses. It does not matter whether the injured person is a minor or an adult. In post-Act cases, living expenses may be paid out of the compensation award for loss of earnings. In pre-Act cases, such compensation has been held by the court to be subject to the $30,000 cap. 18 Cl.Ct. at 654.

### b. Future Living Arrangements

■ As noted above, § 2115(c) of the Act provides that the amount of compensation awarded for residential and custodial care and services "shall be sufficient to enable the compensated person to remain living at home." Donald would prefer to stay at home after his parents are gone, but his own rehabilitation expert, Mr. Olson, testified that this would not be in Donald's best interests.

In construing the Act, it must be kept in mind that it was drafted with young victims in mind. *See* Report at 13–14. Congress did not want parents to be forced to institutionalize their children, so it expressly provided for compensation to cover costs of home-based care. But the statutory provision for home-based care must be given a reasonable construction. It would not be reasonable or in Donald's best interests to provide for home-based care when his parents are gone. He need not be left alone in a large house. Further, § 2115(a)(II) does not provide for compensation for general housekeeping expenses, and there is no assurance that Donald will have resources to maintain the house in the future. Therefore, the award for future living expenses should be based on the premise that Donald will move into a life care center at a cost of $22,006 per year when his parents are no longer able to care for him. Ex. 11 at 3.

### c. Miscellaneous Costs

■ Mr. Olson recommended that Donald should be given counseling to prepare him for independent living. This would involve an immediate cost of $3,960 and $720 annually hereafter. *Id.* at 3–4. This is a reasonable recommendation and should be allowed.

■ Once Donald moves out of the family home, he will need access to transportation to meet his medical and rehabilitative care needs. Mr. Olson recommended a bus pass at an annual cost of $120. *Id.* at 3. This, too, is reasonable and should be allowed.

### d. Present Value

■ Dr. Griffiths calculated the present value of Donald's future needs based on Mr. Olson's report. His calculations are contained in exhibit 12. He assumed a life expectancy of 8.6 years for Mrs. Shaw and 10.7 years for Mr. Shaw based on the Colorado statutory life expectancy table. He also used the discount rate adopted in the Report. Dr. Griffith's method of calculation is acceptable, but it is not reasonable to expect parents to be able to care for their children until the parents die. Aged people generally weaken physically and/or mentally before they die. Therefore, it is reasonable to assume that Donald's parents will only be able to provide care for him through 1996. Based on this analysis, the undersigned recommends a present value award of $758,319 for the items discussed hereinabove. The calculations are set out in Appendix A hereto.

## ATTORNEYS' FEES AND COSTS

### a. Attorneys' Fees

■ The Report recommended compensating petitioners' attorney at the rate of $100 per hour for 68.85 hours of attorney time, and $50 per hour for 25 hours of paralegal time, for a total of $8,135. Report at 16. Petitioner has requested additional compensation of $7,850 for 78.5 additional hours of attorney time. The time entries appear to be reasonable and the request should be allowed in full.

### b. Costs

The Report recommended reimbursing petitioners for advanced costs of $2,215.42. It recommended disallowing all but $30 per day of expert witness fees. *Id.* at 16–17. In its Opinion, the court indicated that expert witness fees should not be limited to $30 per day for in court testimony. Opinion at 19. Therefore, of the original costs claimed $3,245.32 should have been allowed. Petitioners have requested additional costs of $5,100.43, all of which should be allowed.

## RECOMMENDED FINDINGS OF FACT

The findings of fact proposed at pp. 8 and 9 of the Report are recommended for adoption without change.

## RECOMMENDED CONCLUSIONS OF LAW

1. Petitioners George Wallace Shaw and Catherine Bramlett Shaw are not entitled to any compensation under the Program.

2. Petitioner Donald Shaw is entitled to an award of $844,577 for future medical and rehabilitative expenses.[4]

3. Petitioner Donald Shaw is entitled to an award of $5,669.25 (or $30,000 less attorneys' fees and costs awarded by the court) for loss of earnings and pain and suffering and emotional distress.

4. Petitioners are entitled to recover reasonable attorneys' fees of $15,985.

5. Petitioners are entitled to recover costs of $8,345.75.

4. This is the sum of the amount recommended in the Report for medical expenses and the

## APPENDIX A

Present Value of Future Residential Care and Miscellaneous Cost

| Year | Amount[a] | Year | Amount |
|------|--------|------|--------|
| 1990 | 4,693 | 2016 | 17,174 |
| 1991 | 834 | 2017 | 16,787 |
| 1992 | 815 | 2018 | 16,410 |
| 1993 | 797 | 2019 | 16,040 |
| 1994 | 779 | 2020 | 15,679 |
| 1995 | 761 | 2021 | 15,327 |
| 1996 | 744 | 2022 | 14,982 |
| 1997 | 26,463 | 2023 | 14,645 |
| 1998 | 25,868 | 2024 | 14,315 |
| 1999 | 25,286 | 2025 | 13,993 |
| 2000 | 24,717 | 2026 | 13,678 |
| 2001 | 24,161 | 2027 | 13,371 |
| 2002 | 23,617 | 2028 | 13,070 |
| 2003 | 23,086 | 2029 | 12,776 |
| 2004 | 22,566 | 2030 | 12,488 |
| 2005 | 22,059 | 2031 | 12,207 |
| 2006 | 21,562 | 2032 | 11,936 |
| 2007 | 21,077 | 2033 | 11,664 |
| 2008 | 20,603 | 2034 | 11,402 |
| 2009 | 20,139 | 2035 | 11,145 |
| 2010 | 19,686 | 2036 | 10,894 |
| 2011 | 19,243 | 2037 | 10,649 |
| 2012 | 18,810 | 2038 | 10,410 |
| 2013 | 18,387 | 2039 | 10,175 |
| 2014 | 17,973 | 2040 | 9,946 |
| 2015 | 17,569 | 2041[b] | 4,861 |

TOTAL: $758,319

[a] Calculated at 118.5% of the base amount discounted at 2.25% per annum.

[b] Six months only.

amount recommended herein for future living expenses.