Conway Beverley Carter
BROWN, Petitioner,

v.

SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 88–24–V.

United States Claims Court.

Nov. 17, 1989.

Edward M. Macon, Richmond, Va., attorney of record, for petitioner.

Barbara J. Hudson, Rockville, Md., attorney of record, for respondent.

## OPINION [1]

REGINALD W. GIBSON, Judge:

This is an action for compensation, filed by Conway Beverley Carter Brown (petitioner) on October 1, 1988, and subsequently amended on February 7, 1989, commenced under the authority of the National Vaccine Injury Compensation Program, codified as amended at 42 U.S.C. §§ 300aa–10, *et seq.* (West Supp.1989) (the Program).[2]

---

1. This decision may contain information that should not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12 (West Supp.1989). Accordingly, within 14 days of the date of this decision, the parties shall file a memorandum designating any material subject to § 300aa–12 and such material will be deleted for public access. If upon review of this decision, there are no objec-

tions filed on or before the expiration of the 14 days, it shall be deemed that there is no material subject to § 300aa–12.

2. The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, codified as amended at 42 U.S.C. §§ 300aa–1, *et seq.* (West Supp.1989).

In support of her claim, petitioner has alleged that she received an oral polio vaccine (OPV) immunization on March 10, 1967; that said vaccine caused the permanent polio-related disabilities from which she has suffered since early April, 1967; that said injuries satisfy all the relevant statutory requirements set forth in the Program; and that she is therefore eligible and entitled to a compensation award under the Program. The matter was assigned to Special Master Paul T. Baird for proceedings enumerated in 42 U.S.C. § 300aa–12(c)(2) (West Supp.1989), which culminated in a hearing on July 21, 1989.

Thereafter, the Special Master filed his Report and Recommended Decision (Report) on September 13, 1989, which proposed the following eight findings of fact:

1. Petitioner received a vaccine set forth on the Vaccine Injury Table, namely, oral polio vaccine;

2. The vaccine was received in the United States, in the State of Connecticut;

3. Petitioner sustained an injury, disability, illness, or condition set forth in the Vaccine Injury Table—paralytic polio—in association with the polio vaccine, the first symptom of which appeared within 30 days after administration of the vaccine;

4. Petitioner suffered the residual effects of such disability for longer than six months after the administration of the vaccine, and continues to suffer such residual effects;

5. Petitioner has incurred unreimbursable expenses due to such disability in an amount greater than $1,000;

6. Petitioner has not previously collected an award or settlement in a civil action for damages, nor has any civil action been filed;

7. Petitioner's disability was not due to factors unrelated to the administration of the oral polio vaccine; [and]

8. As a result of her vaccine-related disability, petitioner has a present need for vocational and physical therapy, and will require additional therapy, surgery, home assistance, home modifications, a wheelchair and a van in the future.

The Special Master concluded from the foregoing that petitioner was entitled to a compensation award, setting forth three proposed conclusions of law:

1. Petitioner is entitled to an award of $652,590 for future medical and rehabilitative expenses;[3]

2. Petitioner is entitled to an award of $200,000 for pain and suffering and emotional distress;

3. Petitioner is entitled to reasonable attorney fees and costs in the amount of $28,852.76.[4]

The Department of Health and Human Services (DHHS or respondent) filed an objection to the Report of the Special Master on October 3, 1989.[5] The petitioner's response to this objection was filed on October 30, 1989, and thereafter, on November 3, 1989, the petitioner filed a motion to strike both the respondent's objection to the Special Master's Report and the respondent's appearance. Given the foregoing, petitioner moved for entry of a default judgment on November 8, 1989.[6] This

---

3. The Special Master made the following findings with respect to future medical and rehabilitative expenses:
   a) Rehabilitation counseling, vocational counseling, and other training—$5,900;
   b) Medical surgery expenses, mobility assistance, and architectural modifications—$316,230;
   c) Continuing expenses—$330,460.
   (For details, see Appendix A attached.) These figures were calculated after being discounted for the purpose of determining present value.

4. Specifically, the Special Master concluded that petitioner was entitled to $24,136.00 in attorney fees, and $4,716.76 in costs.

5. The DHHS was originally represented by the Department of Justice, which withdrew its representation by notice filed May 26, 1989. Thus, during subsequent proceedings, including the July 21, 1989 hearing, there were no further submissions or appearances made on the respondent's behalf. However, the DHHS filed a notice of appearance on October 3, 1989, the date upon which the aforementioned objection was similarly filed.

6. Both of petitioner's motions were denied on November 17, 1989, because we have chosen to undertake a review of the proceedings below pursuant to 42 U.S.C. § 300aa–12(d)(1) (West Supp.1989). Thus, because we may make *de*

court now undertakes a review of the matter pursuant to 42 U.S.C. § 300aa–12(d)(1) (West Supp.1989).

*Facts*

The facts in this case are based on documentary and testimonial evidence received in the course of the July 21, 1989 hearing before the Special Master. Petitioner was allowed to present evidence both through witnesses produced at the hearing and through written testimony submitted in the form of affidavits or depositions.[7] Petitioner testified in person at the hearing, as did her parents, Charles J. Brown and Nancy Gatewood Brown. Robert Winston Cook, Chairman of the Department of Economics at the University of Richmond, also appeared as a witness to support petitioner's present value compensation award calculations. The depositions of Walter A. Camp, M.D., a neurologist from Greenwich, Connecticut, Nathan Kaplan, M.D., and James Francis Hammill, M.D., a neurologist and professor of clinical neurology at Columbia University Medical School, were received into evidence as if read into the record. This procedure was also followed with respect to the affidavits of Peter Kristian Melberg, a certified rehabilitation counselor, Dr. Kaplan, Dr. Camp, J. Frederick Lee, M.D., a physician who treated petitioner during her infancy, and Katherine B. Newell, a physical therapist licensed in the Commonwealth of Virginia. Dr. Camp, Mr. Melberg, and Ms. Newell were examined by telephone during the hearing. Subsequent to the hearing, the affidavits of Dr. Hammill and Gayle G. Arnold, M.D., and a summary of future medical expenses purportedly introduced at the hearing were filed and received as part of the evidentiary record. Respondent did not appear at the hearing, counsel having withdrawn on May 26, 1989.

The Report of the Special Master accurately states the facts elicited from the evidence presented at the hearing, and those facts relevant to this matter are summarized here. Petitioner was born to Charles and Nancy Brown on October 8, 1966, at Greenwich Hospital in Greenwich, Connecticut. A full-term baby, weighing 6 lbs., 13 oz., petitioner was described as a healthy normal child by her mother from the time of birth to March, 1967. The record contained no evidence to the contrary.

Mrs. Brown took petitioner to the office of Dr. Lee for a well visit and an immunization shot on March 10, 1967. This fact was supported by Mrs. Brown's calendar for the week of March 5, 1967, which contained an entry stating "Conway to Dr. Lee—time 10:45," Pl.Ex. 19, and by a billing statement from Dr. Lee showing a well visit and immunization on March 10, 1967, Pl.Ex. 17. Mrs. Brown testified that petitioner received a polio vaccination during that visit, and that the Sabin oral polio vaccine was administered, in Mrs. Brown's presence, on a sugar cube by a nurse in the employ of Dr. Lee.

On the next day, after petitioner was left in the care of a registered nurse, her parents and three of her siblings left for a three-week visit to Europe. Petitioner became ill in their absence, and was visited at home by Dr. Lee on March 27, 29, 31 and April 2. Upon their return from Europe on April 3, 1967, both Mr. and Mrs. Brown were shocked by the condition in which they discovered petitioner. The Browns immediately summoned Dr. Lee, who apparently had not considered the situation to be serious prior to that time, and they subsequently decided to take petitioner to the hospital the next morning.

At the Greenwich Hospital, petitioner was examined by Dr. Camp, a neurologist.

---

*novo* determinations with respect to any matter, whether the respondent made an appearance or not is immaterial. A decision to undertake review compels us to determine whether petitioner has complied with all applicable statutory requirements, and award compensation accordingly.

7. The Special Master permitted the admission of written testimony in the form of affidavits or depositions that were received in evidence as if they had been read into the record. However, as a condition on this procedure, petitioner was required to arrange the availability of those witnesses for telephonic examination during the hearing.

He viewed the situation as grave, and advised the Browns that a spinal tap should be performed. The spinal tap disclosed a viral infection, which supported Dr. Camp's fears of a polio infection. He was further concerned by Dr. Lee's disclosure of the recent administration of the polio vaccine.

As it turned out, petitioner had in fact contracted polio. Consequently, she suffered severe muscle atrophy and paralysis, presently manifested in a marked weakness of the left lower extremity, including her toes, ankle, knee, thigh and hip. She also has weakness at the ankle and through the knee of her right lower extremity. Her right upper extremity is now nothing more than a limp, wasted member with a continuing pattern of no functional movement at the shoulder, elbow, wrist, or fingers. Petitioner is restricted to the use of her left arm only for all practical purposes. None of these maladies have improved over the 23 years of petitioner's life.

As a consequence of intensive rehabilitation, she has learned to walk without braces, but petitioner has a very deforming limp, hip posture, and spinal curvature. The sum of these deformities has produced a distorted gait, a propensity to fall on occasion, and several back, hip, and leg pains following prolonged periods of standing. While petitioner is able to lift light objects, she has difficulty carrying anything, as well as trouble reaching or opening things. Her motor endurance level is probably 50% or less than that of a comparably conditioned young adult. Petitioner has, nonetheless, completed both high school and college. She received a Bachelor of Arts degree in history from Dennison University in the spring of 1989. Petitioner is now living with her parents and is unemployed, although she would like to work. She is also able to drive an automobile with an automatic transmission.

At the hearing, petitioner acknowledged that her condition has been relatively stable for the length of her memory. Recently, however, she has noticed a subtle deterioration in the form of "more frequent pains and things like that." She further introduced evidence of out-of-pocket medical expenses in excess of $25,000 through her father, Charles Brown. He stated that some of these expenses were covered by medical insurance, although a substantial portion of these expenses were paid out of Mr. Brown's personal funds.

*Discussion*

In this case we are faced with the resolution of two issues. First, it is incumbent on this court to determine whether petitioner is entitled to receive *any* compensation award under the Program. Second, if petitioner satisfies all applicable statutory criteria relating to eligibility, we must next determine what types of compensation are available and, further, we must examine the record in order to determine the proper amount of any compensation award to which petitioner may be entitled.

A. Eligibility

The determination of whether a petitioner is entitled to compensation under the National Vaccine Injury Compensation Program is governed at the outset by the statutory requirements outlined in 42 U.S.C. § 300aa–13 (West Supp.1989). The general rule set forth in § 300aa–13(a)(1) states in pertinent part:

> Compensation shall be awarded under the Program to a petitioner if the court finds on the record as a whole—
>
> > (A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and (B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.
>
> The court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.

It is therefore clear that a petitioner must prove each and every element required under 42 U.S.C. § 300aa–11(c)(1) (West Supp.1989) by a preponderance of the evidence. If this burden is satisfied, a petitioner need not prove actual causation

and, consequently, will be entitled to a compensation award. The satisfaction of the burden presumes, of course, that there is not a preponderance of countervailing evidence suggesting an alternative cause of the disability, injury, or condition. *See* 42 U.S.C. § 300aa–13(a)(1)(B).

Consequently, by explicit reference to § 300aa–11(c)(1), the petitioner in this case must, under § 300aa–13(a)(1)(A), demonstrate seven facts. Petitioner must show, by a preponderance of the evidence that:

1. She received a vaccine set forth in the Vaccine Injury Table, § 300aa–11(c)(1)(A);

2. She received the vaccine in the United States, § 300aa–11(c)(1)(B)(i)(I):

3. She sustained an injury, illness, disability, or condition set forth in the Vaccine Injury Table, § 300aa–11(c)(1)(C)(i);

4. The first symptoms occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, § 300aa–11(c)(1)(C)(i);

5. She suffered residual effects of the disability for more than six months following administration, § 300aa–11(c)(1)(D)(i);

6. She incurred unreimbursable expenses, due in whole or in part to her disability, in excess of $1,000, § 300aa–11(c)(1)(D)(i); and

7. She has not previously collected an award or settlement in a civil action for damages associated with her vaccine-related injury, § 300aa–11(c)(1)(E).

Where proof of these elements are based on the allegations of the petitioner alone, § 300aa–13(a) requires substantiation by either "medical records or medical opinion." However, in cases where proof of some of the above-enumerated elements depends in part on the testimony of lay witnesses or, as in this case parents of the petitioner, and not solely on the petitioner's claims, substantiation by medical records or medical opinion is not the exclusive means of satisfying the burden set forth in § 300aa–13(a). Nonetheless, even in such circumstances, petitioner cannot succeed without the aid of medical records or medical opinion. While not the exclusive means of substantiating a claim for compensation, medical records and medical opinion must be viewed as very persuasive, and often the most reliable evidence. In this context then, we find that petitioner here has proven each of the above-enumerated elements by a preponderance of the evidence as required under § 300aa–13(a)(1)(A). Conversely, there is no evidence in the record to suggest alternative causation. *See* § 300aa–13(a)(1)(B).

Petitioner's highest hurdle in this case involved producing satisfactory evidence to prove that she received a vaccine set forth in the Vaccine Injury Table. *See* Item # 1, *supra.* She claims that she was given the Sabin polio vaccine, which is an oral polio vaccine (OPV),[8] on March 10, 1967. Petitioner's claim to that effect, as contained in her affidavit and testimony, are not probative on this question. Both must be viewed as unadulterated hearsay, due to the fact that she was only five months of age at the time the vaccine was administered. Her testimony on this point is based, therefore, upon information passed along by her parents, which consequently disqualifies her assertions with respect to the ultimate question, the receipt of an OPV on March 10, 1967.

Petitioner's inability to establish receipt of an OPV by her own testimony is not, however, fatal to her claim. Petitioner's claim is supported first by the testimony of

8. The Sabin vaccine is a live-attenuated virus which is administered orally. This vaccine has been the predominant polio vaccine since 1963. The Sabin vaccine is to be distinguished from the Salk vaccine, which is an inactivated polio vaccine administered by subcutaneous injection. Fenichel, *Neurological Complications of Immunization,* Ann. Neurol. 12:119, 125 (1982); Affidavit of Gayle G. Arnold, M.D. The distinction is a crucial one in this case, as the Vaccine Injury Table contains provisions for polio vaccines resulting in paralytic polio like that suffered by petitioner. However, inactivated polio vaccine is not included as a vaccine causing paralytic polio on the Vaccine Injury Table. *See* 42 U.S.C. § 300aa–14(a)(III) (West Supp.1989). Therefore, since petitioner suffers from paralytic polio, proof of receiving an OPV—the Sabin polio vaccine—is a central element of her case.

her mother, Nancy Gatewood Brown. Mrs. Brown testified that she took petitioner to Dr. Lee's office for a polio immunization on March 10, 1967. Tr. 34. She further stated that during that visit to Dr. Lee's office, petitioner received the Sabin polio vaccine, which was administered orally on a sugar cube. Tr. 35. Mrs. Brown was in the office when the vaccine was administered by a nurse in the employ of Dr. Lee, and personally witnessed petitioner digest the sugar cube. Tr. 35. Further evidence probative of the facts alleged by Mrs. Brown may be found in her personal calendar for the week of March 5, 1967. Pl.Ex. 19. Mrs. Brown's calendar contained an entry on March 10, 1967, which stated "Conway to Dr. Lee—time 10:45." We view this as reliable evidence which corroborates Mrs. Brown's testimony to the effect that petitioner was in fact taken to visit Dr. Lee's office on March 10, 1967.

■ Both the purpose of the visit and what took place during the visit on March 10, 1967, have been adequately substantiated by Pl.Ex. 19, a billing statement from Dr. Lee for services rendered to petitioner between September 7, 1966 and May 1, 1967. An entry on March 10, 1967, lists charges for "OV" and "IM." Code explanations at the bottom of the bill designate "OV" as a well child visit, and "IM" as an immunization. This document not only corroborates the testimony of Mrs. Brown, it provides both the diagnosis, a well child, and the treatment, preventive medicine in the form of an immunization. The statement, introduced through Mrs. Brown, is admissible as an exception to the hearsay rule as both a statement of an existing physical condition, Fed.R.Evid., Rule 803(3), and as the record of a regularly conducted business activity, Fed.R.Evid., Rule 803(6). Therefore, we view the cumulative effect of these evidentiary items, the testimony of Mrs. Brown, the personal calendar of Mrs. Brown, and the billing statement from Dr. Lee, as sufficient to establish, by a preponderance of the evidence, that petitioner did in fact receive the Sabin polio vaccine as set forth on the Vaccine Injury Table. *See* § 300aa–14(a)(III).

■ We find that petitioner has, with considerably less difficulty, proven, by a preponderance of the evidence, the remainder of the required elements enumerated above. The Sabin vaccine was administered to petitioner in Greenwich, Connecticut, *see* Item # 2, *supra;* she sustained paralytic polio, which is an injury enumerated on the Vaccine Injury Table, *see* Item # 3, *supra;* she suffered the first symptoms of paralytic polio within 30 days of the Sabin polio vaccination, as required by the Vaccine Injury Table, *see* Item # 4, *supra;* she suffered residual effects of paralytic polio for more than six months following administration of the Sabin polio vaccine and, in fact, continues to suffer from paralytic polio today, *see* Item # 5, *supra;* she·(or her father) has incurred more than $1,000 in unreimbursable expenses due to her affliction with paralytic polio, *see* Item # 6, *supra;* and she has not collected any damages in a civil action as a result of her paralytic polio disability, *see* Item # 7, *supra.* Consequently, we hold that petitioner has proven her eligibility for a compensation award under the Program by a preponderance of the evidence as required under § 300aa–13(a)(1)(A).

## B. Compensation

■ As demonstrated above, petitioner received the Sabin polio vaccine on March 10, 1967, and began to exhibit the symptoms of paralytic polio within 30 days. As such, it is clear that petitioner incurred her vaccine-related injury well before October 1, 1988, the effective date of the National Vaccine Injury Compensation Program. *See* 42 U.S.C. §§ 300aa–10, *et seq.* (West Supp.1989). The compensation available for vaccine-related injuries or deaths occurring before the effective date of the Program is governed by 42 U.S.C. § 300aa–15(b) (West Supp.1989), which states:

Compensation awarded under the Program to a petitioner under section 300aa–11 of this title for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subpart may not include the

compensation described in paragraph (1)(B) of subsection (a) of this section and may include attorneys' fees and other costs included in a judgment under subsection (e) of this section, except that the total amount that may be paid as compensation under paragraph (3) and (4) of subsection (a) of this section and included as attorneys' fees and other costs under subsection (e) of this section may not exceed $30,000.[9]

This provision has already generated significant interpretation problems. *See Shaw v. Secretary of the Department of Health and Human Services*, 18 Cl.Ct. 646 (Cl.Ct. Nov. 7, 1989); *Mikulich v. Secretary of the Department of Health and Human Services*, 18 Cl.Ct. 253 (1989). Under § 300aa–15(b), both of these cases grant limited relief to petitioners who were injured prior to the effective date of the Program, while acknowledging, either explicitly, *Shaw*, 18 Cl.Ct. at 652–53, or implicitly, *Mikulich*, 18 Cl.Ct. at 254, that § 300aa–15(b) grants no affirmative right to compensation. In so doing, both *Shaw* and *Mikulich* skirted the settled principle that there can be no recovery from the United States without an explicit waiver of sovereign immunity. Additionally, any such waiver of sovereign immunity must be strictly construed. *See Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685, 103 S.Ct. 3274, 3277–78, 77 L.Ed.2d 938 (1983); *Zumerling v. Marsh*, 783 F.2d 1032, 1034 (Fed. Cir.1986); *Kay Manufacturing Co. v. United States*, 699 F.2d 1376, 1378 (Fed. Cir.1983); *Bennett v. Department of the Navy*, 699 F.2d 1140, 1145 (Fed.Cir.1983); *Morgan v. United States*, 12 Cl.Ct. 247, 253 (1987); *Gregory Lumber Co. v. United States*, 9 Cl.Ct. 503, 525 (1986). Because of the foregoing, it is necessary to examine the statute in order to determine whether Congress did in fact provide the right for a petitioner to receive a compensation award for vaccine-related injuries sustained *before* the effective date of the Program.

The starting point in statutory interpretation is to carefully examine the text of the section in issue and to determine its meaning from its composition and structure. Sutherland, Statutory Construction, § 47.01 (4th ed. 1984). Clearly, § 300aa–15(b) makes reference to the general rule on compensation for vaccine-related injuries stemming from the administration of the vaccine after the effective date of the Program set forth in § 300aa–15(a) (West Supp.1989). However, § 300aa–15(a) explicitly provides compensation for vaccine-related injuries or deaths associated with the administration of the vaccine *after* the effective date of the Program. It includes post-judgment medical expenses, § 300aa–15(a)(1)(A); pre-judgment medical expenses, § 300aa–15(a)(1)(B); an award of $250,000 in the event of a vaccine-related death, § 300aa–15(a)(2); loss of earnings, § 300aa–15(a)(3); and an award for pain and suffering and emotional distress resulting from a vaccine-related injury in an amount not to exceed $250,000, § 300aa–15(a)(4). By reference to § 300aa–15(a), § 300aa–15(b) clearly prohibits any compensation for prejudgment medical expenses as contemplated by § 300aa–15(a)(1)(B). However, § 300aa–15(b), in referring to § 300aa–15(a), includes no language modifying the introductory sentence of the previous section, which is expressly limited to compensation for injuries incurred *after* the effective date of the statute. At first blush, a literal interpretation would therefore preclude petitioner from recovering any form of compensation listed in § 300aa–15(a).

Notwithstanding the foregoing, and after a careful review, we conclude that such a construction would not be consistent with and in furtherance of congressional intent. An inclusive review of all of the para-

---

**9.** 42 U.S.C. § 300aa–15(b) was amended on December 22, 1987. Prior to that date, the statute read in pertinent part:

Compensation awarded under the Program to a petitioner ... for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subtitle shall only include the compensation described in paragraphs (1)(A) and (2) of subsection (a).

National Childhood Vaccine Injury Act of 1986, P.L. No. 99–660, 100 Stat. 3755, 3768.

842

graphs within the purview of § 300aa–15 discloses an overriding intention to authorize the payment of compensation to those who have sustained vaccine-related injuries, *both* before and after the effective date of the statute. *See* Sutherland, Statutory Construction, § 46.05 (4th ed. 1984) (statute must be construed as a whole). It is possible to produce a harmonious result only if each paragraph contained in § 300aa–15 is construed in connection with the rest.[10] By employing these principles of statutory construction, and by reference to § 300aa–15(a), we conclude that a petitioner who has sustained a vaccine-related injury as a result of a vaccine administered prior to the effective date of the Program may be entitled to several types of compensation under § 300aa–15(b), except, of course, as may be excluded by § 300aa–15(a)(1)(B). Such compensation may include an award for incurred and reasonably projected unreimbursable postjudgment medical expenses, etc., under § 300aa–15(a)(1)(A); $250,000 in the event of a vaccine-related death under § 300aa–15(a)(2), loss of earnings under § 300aa–15(a)(3), and an award not to exceed $250,000 for pain and suffering and emotional distress under § 300aa–15(a)(4).

(1) *Unreimbursable Post–Judgment Expenses under §§ 300aa–15(b), 15(a)(2)*

■ In the matter presently before the court, the Special Master examined each of the types of compensation available to petitioner. He then recommended an award of $5,900 for rehabilitation, vocational counseling, and other training expenses. This award is supported by the record, and is therefore allowed. The Special Master also recommended an award of $316,230 for periodic and one-time expenses. This figure included medical surgery expenses, mobility assistance expenses, and expenditures for architectural modifications. This award is, for the most part, supported by

the record. However, the Special Master's recommended award of $24,183 for two vans equipped to handle a wheelchair, one when petitioner reaches 45 years of age and the other at 60 years of age, are not supported by the record, as there was insufficient evidence to prove by a preponderance that petitioner will become permanently non-ambulatory. Therefore, the Special Master's present value award of $24,183 is hereby rejected. Thus, we award petitioner $292,047 for periodic and one-time expenses.

■ The Special Master also recommended in present value terms $330,460 for continuing expenses, the majority of which, $325,227, was devoted to home aid assistance. This award is not supported by the record as, once more, there is insufficient proof by a preponderance of the evidence that petitioner will require the type of home aid assistance contemplated by the Special Master, *i.e.*, an allowance of $15,000 per year, on a continuous annual basis between the age of 40 and 78, discounted to present value of $325,227 over that 38-year period. As the Special Master concedes, the evidence does not support a conclusion that petitioner will become permanently non-ambulatory and, as such, an award of $15,000 per year in home aid assistance is unjustified.

■ Instead, we view the evidence for an award of $15,000 in home aid assistance following the projected major surgery at age 40 or 60 as sufficiently probative. The record establishes that petitioner will probably require major surgery around 40 or 60 years of age. Given such, we believe she will undoubtedly require substantial home aid assistance following each. It further follows that her recovery period at age 60 will be more extensive than at age 40. Therefore, we find that the evidence justi-

---

**10.** The Special Master concluded that when § 300aa–15(b) was amended in 1987 (*see* note 9, *supra*), the deletion of language which strictly limited the recovery of compensation for vaccine-related injuries sustained *before* the effective date of the Program to the awards enumerated in § 300aa–15(a)(1)(A) and § 300aa–15(a)(2), the substitution of language

prohibiting only the recovery of expenses as set forth in § 300aa–15(a)(1)(B) effectively broadened available compensation. Thus, those persons injured *before* October 1, 1988, became eligible for every *other* element of compensation listed in § 300aa–15(a). This reasoning, we believe, is consistent with an approach that interprets the statute as a whole.

fies an allowance of an award of compensation for one year home aid assistance following anticipated operations around age 40, and an allowance for two years home aid assistance following anticipated operations around age 60. As for the remaining recommended continuing expenses, the $1,037 van maintenance costs are disallowed. The rest of the suggested expenses are supported by the record, and we therefore award petitioner $26,628.50 for continuing expenses. In total then, we find the petitioner entitled to a compensation award under § 300aa–15(b), by implied reference to the post-judgment medical expenses allowed under § 300aa–15(a)(1)(A), of $324,575.50.

## (2) *Pain and Suffering and Emotional Distress under §§ 300aa–15(b), 15(a)(4)*

█ Pain and suffering and emotional distress, actual and projected, is compensable under the Program, under authority of § 300aa–15(b) and its implied reference to § 300aa–15(a)(4), in an amount "not to exceed $250,000." The amount awarded is discretionary,[11] depending, of course, on proof in the record by a preponderance of the evidence. Here, the Special Master proposed an award of $200,000.[12] However, the Special Master made no findings with respect to proof in the record of pain and suffering (neither actual nor projected) to the extent of the recommended award. Thus, while we recognize that petitioner has suffered both physically and emotionally as a result of her disability in the past, and that she will continue to suffer physically and emotionally in the future following the projected multiple surgeries, we cannot adopt the Special Master's bland recommendation when the record contains insufficient evidence to justify an award of $200,000. Petitioner has failed to quantify her pain and suffering in terms of dollar value. Such evidence as is contained in the

record is only conclusory in nature, and that evidence cannot support an award of $200,000. Thus, we reject the Special Master's recommendation and, instead, award $175,000 for actual and projected pain and suffering and emotional distress under § 300aa–15(b) and its implied reference to § 300aa–15(a)(4).

## (3) *Attorney Fees and Costs under § 300aa–15(e)(1)*

█ The Program also requires this court to award attorney fees and costs as an additional element of compensation. Specifically, § 300aa–15(e)(1) provides, in pertinent part:

> The judgment of the United States Claims Court ... awarding compensation shall include an amount to cover—
>
> (A) reasonable attorneys' fees, and
>
> (B) other costs,
>
> incurred in any proceeding on such petition. ...

Under the authority of this section, the Special Master recommended an award of compensation in the amount of $28,852.76 to cover reasonable attorney fees and costs. This figure, when dissected, includes $24,136 for attorneys' fees which allegedly satisfied the statutory requirement of reasonableness. The Special Master reached this figure by allowing fees charged by four attorneys associated with the firm of McGuire, Woods, Battle and Booth of Richmond, Virginia, for 224.6 hours of work at rates ranging from $95 an hour to $180 an hour. Pursuant to § 300aa–15(e)(1), it is clear that it is incumbent on petitioner's counsel to *prove* by a preponderance of the evidence that both the hours assessed and the rates charged are reasonable within the contemplation of the statute. The fee applicant carries that burden of proof. To meet that burden, the

---

11. The discretionary nature of an award for pain and suffering and emotional distress is evident in the statute. *See* § 300aa–15(a)(4). This is to be distinguished from the situation in which there is a vaccine-related death, in which case a petitioner is entitled to an award of $250,000. *See* § 300aa–15(a)(2). There would be no discretion involved in such a case.

12. The Special Master recommended disallowance of an award for loss of earnings under §§ 300aa–15(b), 15(a)(3). We agree with the Special Master, as petitioner failed to prove entitlement to such an award by a preponderance of the evidence.

applicant must submit evidence supporting the hours expended and the rates claimed.

A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly.

*Martin v. United States,* 12 Cl.Ct. 223, 227 (1987), *citing Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

While we do not quibble with the hours allowed by the Special Master, we do not find adequate proof in the record for the rates charged by petitioner's attorneys in this matter. In support of their August 2, 1989 motion for attorney fees and costs, petitioner's counsel offered his firm billing statements, an affidavit of each of the four attorneys who worked on the case, and an affidavit of one Douglas W. Davis. Mr. Davis, a partner in another Virginia law firm, averred that (i) he has practiced law in Virginia for 15 years; (ii) he was *generally* acquainted with the facts of this case; (iii) cases of this type are very time consuming; (iv) he has known of the senior attorney involved herein, one Rosewell Page III, for 15 years and that Mr. Page has an excellent reputation in Richmond and throughout Virginia; (v) he reviewed the billing statements in preparation of this case; (vi) in his opinion, the time spent and services rendered in this case are fair and reasonable given the novelty of the Program and the fact that petitioner's injury occurred some 22 years ago in Connecticut, and that three of petitioner's witnesses reside in New York or Connecticut; (vii) the rates charged by the attorneys involved with this case are consistent with the fees charged by civil litigation attorneys of comparable skill and reputation practicing in Richmond, Virginia; and (viii) in the opinion of Mr. Davis, the total amount of fees charged here were fair and reasonable given the nature and difficulty of the case.

We do not view the evidence advanced by petitioner's counsel in support of their claimed fees as sufficient to constitute *prima facie* evidence of reasonableness. A bald assertion that the rates charged are fair and reasonable does not cut muster. The affidavits included as part of the subject application for fees is totally unsupported by any demonstrative showing of why the rates charged here are reasonable. *See generally Gregson v. Secretary of the Department of Health and Human Services,* 17 Cl.Ct. 19, 24–25 (1989) (methods of proving prevailing market rates as reasonable), *citing* Newberg, Attorney Fee Awards, 198 (1986). In the absence of such proof, and without specific guidance in the statute, we embrace as persuasive the pronouncement of the United States Supreme Court in *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 2553–54, 101 L.Ed.2d 490, 509 (1988). There the Court stated, in an Equal Access to Justice Act (EAJA) case, that "Congress thought that $75 an hour was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be." Consequently, due to the lack of proof as to reasonableness, the attorney fees in this matter shall be limited to $75 an hour. We award that fee for the 224.6 hours allowed by the Special Master. In other words, we hereby award $16,845.00 in attorney fees.

■ The Special Master also recommended an award for costs in the amount of $4,716.76. In so doing, however, he limited expert witness fees to $30 per day, under the supposed requirements of 28 U.S.C. § 1821 (1982). Under the authority of that statute and *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), the Special Master thereby disallowed all but $150 of the $4,475 petitioner claimed for expert witness fees. In light of the explicit statutory authorization in § 300aa–15(e)(1), to award "costs incurred in any proceeding" on a petition for vaccine-related injury, and the statutory requirement to employ expert medical testimony, we, like the court in *Shaw v. Secretary of the Department of Health and Human Services,* 18 Cl.Ct. 646, 655 (1989), conclude that the $30 cap on expert witness fees does not apply to petitions instituted under the Program. Thus, we award an additional amount of $4,325 for expert witness fees claimed by

petitioner. This increase results in a total award for costs in the amount of $9,041.76.[13] In total then, under § 300aa–15(e)(1), we award $25,886.76 for attorney fees and costs.

### (4) *Limitations on Compensation under § 300aa–15*

■ Having concluded that petitioner is entitled to compensation under § 300aa–13(a)(1)(A), that petitioner is entitled to receive $499,575.50 under § 300aa–15(b) by implicit reference to § 300aa–15(a),[14] and that petitioner is entitled to receive $25,886.76 for attorney fees and costs pursuant to § 300aa–15(e)(1), we must now decide whether the Program requires a reduction of that award.

Specifically, we necessarily must examine whether § 300aa–15(b) requires us to limit, in any way, awards made for vaccine-related injuries incurred before the effective date of the Program on October 1, 1988.[15] Both *Shaw v. Secretary of the Department of Health and Human Services,* 18 Cl.Ct. 646 (1989), and *Mikulich v. Secretary of the Department of Health and Human Services,* 18 Cl.Ct. 253 (1989), have construed § 300aa–15(b) in such a way that would limit an award for loss of earnings under § 300aa–15(a)(3), pain and suffering and emotional distress under § 300aa–15(a)(4), and attorney fees under § 300aa–15(e)(1) to $30,000. Under this interpretation, petitioner here would be able to recover only $30,000 for pain and suffering and attorney fees, as opposed to an award of the $201,886.76 to which we believe she is entitled for these two items of compensation under § 300aa–15. Also, both *Shaw* and *Mikulich* premise this conclusion on a strained literal analysis of the

statutory language and reliance on what they describe as helpful "legislative history." We respectfully disagree with the opinions set forth in *Shaw* and *Mikulich,* and, for the reasons set forth hereinafter, we conclude that § 300aa–15(b) is properly construed to impose a limitation on *only* those attorney fees which are directly related to the recovery of compensation for loss of earnings or pain and suffering and emotional distress under paragraphs (3) and (4) of subsection (a) of § 300aa–15. Consequently, we reaffirm the compensation awards set forth earlier in this opinion.

We reach this conclusion following a thorough review of the relevant statutory language, with reference to the appropriate aids to statutory interpretation. As a starting point in our analysis, it is helpful to restate the language of § 300aa–15(b):

> *Compensation awarded under the Program* to a petitioner under section 300aa–11 of this title *for a vaccine-related injury* or death associated with the administration of a vaccine administered *before the effective date of this subpart* may not include the compensation described in paragraph (1)(B) of subsection (a) of this section and *may include attorneys fees and other costs included in a judgment under subsection (e) of this section, except that the total amount that may be paid as compensation under paragraph (3) and (4) of subsection (a) of this section and included as attorneys' fees and other costs under subsection (e) of this section may not exceed $30,000.*

(emphasis added).

The ambiguity created by this subsection relates directly to the $30,000 limitation. While it is agreed that the $30,00 limitation

---

**13.** We approve the remainder of the Special Master's calculations with respect to other costs claimed by petitioner.

**14.** An award of $499,575.50 is equal to the total award of $5,900 in current expenses, $292,047 in periodic and one-time expenses, $26,628.50 for continuing expenses, and $175,000 for pain and suffering.

**15.** The Program also requires this court to examine other adjustments to compensation. *See* § 300aa–15(g) (Program not primarily liable

when an alternative source of compensation is available); § 300aa–15(f)(4) (payment of compensation is to be based on the net present value of the elements included in the compensation award). We agree with both of the determinations made by the Special Master—that there is no evidence of an alternative source of compensation available in this case and his application of various discount rates to determine the present value of the compensation awards subject to that provision.

expressed in § 300aa–15(b) may restrict an award of compensation for reasonable attorney fees and costs as otherwise provided in § 300aa–15(e), there is a question as to the scope of that restriction. More importantly, however, is the threshold question of whether the $30,000 cap places a limitation on the aggregate compensation of loss of earnings awarded under § 300aa–15(a)(3), pain and suffering awarded under § 300aa–15(a)(4), and reasonable attorney fees and costs awarded under § 300aa–15(e)(1). After consulting the statutory language and the available legislative history, both *Shaw* and *Mikulich* conclude that such is the case.

*Shaw* and *Mikulich* rely first on the language of the statute. They divide § 300aa–15(b) into three clauses—the first providing that pre-judgment medical and related expenses are not available in cases where the vaccine-related injury occurred *before* the effective date of the statute; the second permitting an award of attorney fees and costs under § 300aa–15(e); and the third clause permitting awards for loss of earnings and pain and suffering "except that the total amount that may be paid as compensation under paragraphs [for lost earnings and pain and suffering] and included as attorney fees and other costs ... may not exceed $30,000." *Shaw* and *Mikulich* then interpret the words "total amount" to include the sum of the elements listed later in the third clause—*i.e.,* loss of earnings, pain and suffering, and attorney fees and costs as being limited in the aggregate by the $30,000 cap. *Shaw,* 18 Cl.Ct. at 653; *Mikulich,* 18 Cl.Ct. at 255.

We reject this interpretation of § 300aa–15(b), as an analysis which results in an unreasonable limitation on awards for vaccine-related injuries sustained before the effective date of the Program. If we were to adopt the interpretation advanced in *Shaw* and *Mikulich,* the result would, we believe, contradict the express purpose of the statute. Under the Program, awards are to be made to persons suffering from vaccine-related injuries are to be compensated with quickness, ease, *and generosity. See* H.R.Rep. No. 908, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong.

& Admin.News 6287, 6344, 6363. *Mikulich,* 18 Cl.Ct. at 258. concedes that its proposed interpretation would (1) place clients and their counsel in direct financial conflict, (2) unfairly limit fees to an amount that does not reasonably reflect the value of time spent on the case, and (3) produce lower awards in spite of the clear intent that Congress amended § 300aa–15(b) for the purpose of expanding the types of compensation available to persons who sustained vaccine-related injuries before the effective date of the Program.

Such a result would be in direct conflict with what has been called the golden rule of statutory interpretation, namely, that every statute should be construed in a reasonable manner. The unreasonableness of the result produced by one among other possible alternative interpretations of a statute is justification enough for rejecting that interpretation in favor of another which will produce a reasonable result. Sutherland, Statutory Construction, § 45.12 (4th ed. 1984). It is a well-established principle of statutory interpretation that the law favors rational and sensible construction. Departure from the perceived literal construction proposed in *Shaw* and *Mikulich* is justified because that interpretation produces not only an unjust result, but is clearly inconsistent with the purposes and policies of the Program. *See id.* We therefore conclude that the construction of § 300aa–15(b), as proposed by *Shaw* and *Mikulich,* would produce unreasonable results, and it is on that basis that we reject an interpretation that would cap an aggregate award for loss of earnings, pain and suffering, and attorney fees and costs at an amount not to exceed $30,000.

Instead, we construe the statute to limit only those attorney fees and costs incurred with respect to proof of loss of earnings and pain and suffering. They are limited to $30,000, but there is no limitation placed on fees and costs associated with proving any other element of petitioner's case. Thus, in this case, we hold that the petitioner is entitled to the full $175,000 award for pain and suffering without diminution as a

result of § 300aa–15(b). The $30,000 limitation on attorney fees and costs relating to the proof of that element is not relevant in this case, as petitioner's counsel are not entitled to an amount in excess of the statutory limit in any event.

We also address the legislative history cited in support of the interpretation advanced by *Shaw* and *Mikulich*. While admitting that the legislative history is sparse,[16] both cite various language from a report from the Committee on the Budget of the House of Representatives, H.R.Rep. No. 391, 100th Cong., 1st Sess. 690 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–364. The language cited includes the "PURPOSE AND SUMMARY," *Mikulich*, 18 Cl.Ct. at 257, an October 15, 1987 letter to the Committee from the Acting Director of the Congressional Budget Office, *Shaw*, 18 Cl.Ct. at 653, *Mikulich*, 18 Cl.Ct. at 257, and the Committee's section-by-section analysis of the Program, *Shaw*, 18 Cl.Ct. at 653; *Mikulich*, 18 Cl.Ct. at 258.

While these statements appear to suggest that the $30,000 cap in § 300aa–15(b) applies to the aggregate of loss of earnings, pain and suffering, and attorney fees, we do not find them to be a persuasive or reliable expression of the legislative intent. As we observed earlier, see note 16, *supra*, there is no record of any floor debate in Congress on the meaning of § 300aa–15(b) 1987 amendment. Thus, we believe that these statements reflect only the meaning attributed to § 300aa–15(b) by unknown members of the Committee and, in the case of the Acting Director of the CBO, an individualized interpretation. There is no record or indication of Congressional approval for these interpretations. We, like the Special Master, find Justice Scalia's comments in *Blanchard v. Bergeron*, —— U.S. ——, 109 S.Ct. 939, 947, 103 L.Ed.2d 67, 79 (1989), particularly compelling in these circumstances. In discussing the value of committee reports as aids in legislative construction, Justice Scalia stated:

> It is neither compatible with our judicial responsibility of assuring reasoned, consistent and effective application of the statutes of the United States, nor conducive to a genuine effectuation of congressional intent, to give legislative force to each snippet of analysis … in committee reports that are increasingly unreliable evidence of what the voting Members of Congress actually had in mind.

Justice Scalia also noted the deficiencies in relying on legislative history in view of the process employed in the review of committee reports. In *Blanchard*, Justice Scalia expressed serious doubts as to the proportion of congressional members who actually read the committee reports, assuming, of course, that they were published before the vote.[17] Justice Scalia's comments are particularly enlightening in the circumstances under which the massive Omnibus Reconciliation Act of 1987, of which the present amendments were a part, was passed into law.[18]

---

**16.** This is an understatement, as there is no record to show that the 1987 amendments to the Program were ever introduced on the floor of either house of Congress or any comments relating to the purpose or need for these amendments, nor is there any record of a floor debate on the amendments.

**17.** Justice Scalia also described the unreliability of committee reports, portions of which are commonly drafted on the individual initiative of a single committee member under the best circumstances. In the worst case scenario, portions of committee reports may actually be drafted by staff members. *Blanchard*, 109 S.Ct. at 947.

**18.** In his State of the Union address on January 25, 1988, President Reagan made the following comments in reference to the Omnibus Budget

Reconciliation Act of 1987, P.L. No. 100–203, 101 Stat. 1330, which funded nearly the entire operating budget of the United States for fiscal year 1988:

> And then, along came these behemoths. This is the conference report—1,053 pages report weighing 14 pounds. Then this—a reconciliation bill 6 months late that was 1,186 pages long, weighing 15 pounds. And the long-term continuing resolution—this one was 2 months late, and it's 1,057 pages long, weighing 14 pounds. That was a total of 43 pounds of paper and ink. You had 3 hours—yes, 3 hours—to consider each, and took 300 people at my Office of Management and Budget just to read the bill so the Government wouldn't shut down. Congress shouldn't send another one of these. No. And if you do, I will not sign it.

*Conclusion*

In sum, we conclude from the foregoing that petitioner herein has proven, by a preponderance of the evidence, that she is entitled to compensation under the Program. We hereby award petitioner $5,900 in current expenses, $292,047 in periodic expenses, $26,628.50 in continuing expenses, $175,000 for pain and suffering, and $25,886.76 in attorney fees and costs—$525,462.26 in total. The Clerk shall enter judgment accordingly. As petitioner received the Sabin polio vaccine on March 10, 1967, which was prior to the October 1, 1988 effective date of the Program, payment of said compensation shall be made in four equal installments commencing upon entry of judgment. 42 U.S.C. § 300aa–15(f)(4)(B) (West Supp.1989). No additional costs.

IT IS SO ORDERED.

APPENDIX A

Present Value of Future Medical Expenses [*]

Current Expenses

| Item | Amount | Present Value |
|---|---|---|
| Rehabilitation counseling | $1,020 | $1,020 |
| Vocational counseling | 4,680 | 4,680 |
| Training in falling | 200 | 200 |
| | Subtotal: | $5,900 |

Periodic and one-time Expenses

| Item | Age | Amount | Present Value |
|---|---|---|---|
| Wheelchair | 45 | $ 5,200 | $ 2,787 [a] |
| Wheelchair | 60 | 5,200 | 1,746 [a] |
| Van | 45 | 27,740 | 14,869 [a] |
| Van | 60 | 27,740 | 9,314 [a] |
| Architectural modifications | 45 | 35,000 | 23,366 [b] |
| First left hip surgery | 45 | 8,000 | 6,195 [c] |
| Hospitalization | 45 | 15,000 | 12,096 [d] |
| Rehabilitation | 45 | 15,600 | 12,580 [d] |
| Second left hip surgery | 60 | 8,000 | 5,114 [c] |
| Hospitalization | 60 | 15,000 | 10,294 [d] |
| Rehabilitation | 60 | 15,600 | 10,705 [d] |
| First left knee surgery | 45 | 8,000 | 6,195 [c] |
| Hospitalization | 45 | 15,000 | 12,096 [d] |
| Rehabilitation | 45 | 15,600 | 12,580 [d] |
| Second left knee surgery | 60 | 8,000 | 5,114 [c] |
| Hospitalization | 60 | 15,000 | 10,294 [d] |
| Rehabilitation | 60 | 15,600 | 10,705 [d] |
| Left ankle fusion | 50 | 5,000 | 3,632 [c] |
| Hospitalization | 50 | 10,000 | 7,642 [d] |
| Rehabilitation | 50 | 15,600 | 11,921 [d] |
| Right shoulder surgery | 40 | 8,000 | 6,604 [c] |
| Hospitalization | 40 | 15,000 | 12,765 [d] |
| Rehabilitation | 40 | 15,600 | 13,275 [d] |
| Right elbow fusion | 40 | 5,000 | 4,128 [c] |
| Hospitalization | 40 | 5,000 | 4,255 [d] |
| Rehabilitation | 40 | 15,600 | 13,275 [d] |

[*] Because payments in pre-Act cases are made in four annual installments, petitioner's age is deemed to be 25, which will be her age when two of the four annual payments have been received.

Weekly Compilation of Presidential Documents, Vol. 24, No. 4 at 87.

In referring to an unrelated section of the budget act, the *Washington Post* reported editorially: "Not one member in 20 was aware of them as the two houses voted last month. That is how the game is played in the back pages of omnibills like these. It is another example of why such bills—in which enormous issues go not merely undebated, but unrecognized—are such bad ideas." *Washington Post*, Jan. 6, 1988, at A22. Members of Congress were also critical of the process and the result. *See, e.g., Congressional Quarterly*, Vol. 45, No. 51 at 3117–3119.

Periodic and one-time Expenses

| Item | Age | Amount | Present Value |
|---|---|---|---|
| Right wrist fusion | 40 | 3,000 | $ 2,477 [c] |
| Hospitalization | 40 | 5,000 | 4,255 [d] |
| Rehabilitation | 40 | 15,600 | 13,275 [d] |
| Right digits fusion | 40 | 3,000 | 2,477 [c] |
| Hospitalization | 40 | 3,000 | 2,553 [d] |
| Rehabilitation | 40 | 15,600 | 13,275 [d] |
| Lumbar disk fusion | 45 | 12,000 | 9,293 [c] |
| Hospitalization | 45 | 15,000 | 12,096 [d] |
| Rehabilitation | 45 | 15,600 | 12,580 [d] |
| Vocational rehab. counseling | 47 | 510 | 402 [d] |
| | | Subtotal: | $316,230 |

Continuing Expenses

| Item | Age | Annual Amount | Total Present Value |
|---|---|---|---|
| Home aide assistance | 40–78 | $15,000 | $325,227 [e] |
| Annual physical therapy visits | 35–78 | 100 | 3,159 [d] |
| Wheelchair maintenance | 45–50 | 250 | 630 [a] |
| Wheelchair maintenance | 60–65 | 250 | 407 [a] |
| Van maintenance | 45–50 | 250 | 630 [a] |
| Van maintenance | 60–65 | 250 | $ 407 [a] |
| | | Subtotal: | $330,460 |
| | | Total | $652,590 |

[a] Using a net discount rate of 3.07%.
[b] Using a net discount rate of 2%.
[c] Using a net discount rate of 1.27%.
[d] Using a net discount rate of 1.07%.
[e] Using a net discount rate of 1.77%.